# ILLINOIS OFFICIAL REPORTS

## Appellate Court

*Picerno v. 1400 Museum Park Condominium Ass'n*, 2011 IL App (1st) 103505

| | |
|---|---|
| Appellate Court Caption | MICHAEL PICERNO, CHRISTINE PICERNO, and NORIS ARIAS, Plaintiffs-Appellees, v. 1400 MUSEUM PARK CONDOMINIUM ASSOCIATION, an Illinois Not-for-Profit Corporation, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-10-3505 |
| Filed | October 28, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | A judgment allowing plaintiffs, the owners of two corner condominium units at the end of a common element hallway, to build a wall and install a common front door to their units in the hallway for their "safety and convenience" was reversed on the ground that the trial court's interpretation of sections 4(e) and 31 of the Condominium Property Act was contrary to the statute, a long line of authority concerning the interests and rights of the owners of other units, and the condominium declaration applicable to the building at issue. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CH-32655; the Hon. Mary Ann Mason, Judge, presiding. |
| Judgment | Reversed and remanded with directions. |

Counsel on
Appeal

Carrie A. Durkin and Bradford A. LeHew, both of Litchfield Cavo LLP, of Chicago, for appellant.

David L. Rudolph, of Law Offices of David L. Rudolph, of Chicago, for appellees.

Panel

JUSTICE McBRIDE delivered the judgment of the court, with opinion.

Presiding Justice Epstein and Justice J. Gordon concurred in the judgment and opinion.


## OPINION

¶ 1     The defendant, a Chicago residential condominium association, appeals from a summary judgment order in favor of the plaintiffs, the owners of two corner condominium units at the end of a common element hallway, based on the circuit court's finding that the plaintiffs were statutorily entitled to incorporate about eight feet of the hallway into their units as a private foyer accessible only to them because the space was not "necessary or practical for use" by other unit owners. On appeal, the condominium association contends the court misconstrued sections 4(e) and 31 of the Illinois Condominium Property Act (765 ILCS 605/4(e), 31 (West 1998)) (Act) and the pertinent language of the condominium declaration.

¶ 2     The facts are undisputed and are as follows. The plaintiffs' condominium units are on the twenty-third floor of a 32-story building which was constructed in Chicago in 2008 at the intersection of 14th Street and South Michigan Avenue. The building was named "1400 Museum Park" but is commonly known as 100 East 14th Street. The condominium declaration recorded by the developer in May 2008 indicates the lower floors of the building are devoted to parking spaces, there are approximately 10 units per residential floor, and there are a total of about 250 residential units of varying sizes in the building.

¶ 3     In June 2008, husband and wife Michael and Christine Picerno closed on the purchase of unit 2310, a corner unit, and Christine's mother, Noris Arias, closed on the purchase of the adjacent corner unit, 2301. Although not stated by the parties, the record indicates that Noris resided or resides in the unit with her husband, Belasario. The front doors of the two units are opposite each other at the end of the common element hallway and the units share a common wall.

¶ 4     In August 2008, an attorney representing the Picernos and Arias sent a letter to the condominium association announcing their intention to "install a common front door, and connect their two entrances for safety and convenience." Although this wording suggested that a joint entryway would be cut into the wall at the end of the hallway, an attached contractor proposal disclosed plans to actually "BUILD A WALL" somewhere in the hallway and hang the new common entrance door within this structure, at a cost of more than $4,000

for materials and labor. The letter indicated "this modification is specifically permitted by paragraph 11 of the condominium declaration." However, the Picernos and Arias, whom we will refer to collectively as the Picernos, did not proceed with these plans.

¶ 5    In February 2009, Michael Picerno again wrote to the association, "seek[ing] approval to a build a common door between Units 2301 and 2310" based on paragraph 11 of the declaration. He stated, "Our decision to purchase two units in the 1400 Museum Park Building was solely based on being able to build a [wall in the hallway which would contain a] common door between [the units]."

¶ 6    The record indicates Michael's letter was forwarded to the association's attorney and that in March 2009, the attorney sent an e-mail to the board approving the proposal. The attorney quoted section 31 of the Illinois Condominium Property Act (765 ILCS 605/31 (West 1998)) and indicated the law firm could, at the petitioning unit owners' expense, draft an amendment to the condominium declaration stating a portion of common element hallway was being "incorporated into the combined unit." The record on appeal also indicates "Balasario and Noria Aria [*sic*]" paid the law firm's bill for this opinion. Nevertheless, after Michael submitted architectural plans to the board, it rejected the proposal.

¶ 7    At this juncture, attorneys for the Picernos and the board attempted to negotiate a solution and the Picernos threatened to file the instant declaratory judgment action. In a letter dated August 18, 2009, the association's attorney spelled out the board's position:

"Through verbal conversations between your clients and the Board of Directors ('Board'), and your correspondences, your clients have requested a purported 'unit combination' per Section 31 of the *** [Act]. *** Your clients are not requesting merely a unit combination (combining two units owned by the same unit owner by removing a demising wall between the units), [to] which the Board has no objection, but in fact, are requesting the private and exclusive use of approximately eight feet (35+ square feet) of Common Element hallway space. Both your correspondence and the draft complaint cloak the conversion of Common Element hallway space as part of a 'unit combination' which is at best, an erroneous and misguided understanding of the law on this issue, and [at] worst, disingenuous. As such, while you have loosely used the term 'unit combination' in all your correspondences and draft complaint, your clients['] demands for hallway space exceed what is allowed per Section 31."

¶ 8    The letter continued with a discussion of legislative history indicating "Section 31 of the Act was adopted to allow unit owners in condominiums to combine two (or more) units by removing a demising wall separating the units *** with minimal intervention by the board of directors," precedent indicating the proposed change required "100% unit owner approval," and the board's conclusion that it could not allow the hallway to "become a Limited Common Element to Your clients' Unit," but was willing to make it "a licensed area of the Common Elements–upon the following conditions":

"1. Re-Submission of plans and specifications of the proposed improvements to the Common Elements showing a single door for hallway door uniformity (the currently submitted plans show a double door, which is not acceptable to the Board) ***;

2. Your clients pay for an Association retained architect to review and approve the

-3-

plans and specifications;

3. Your clients fund an escrow with the Association to cover any future damage *** [and the removal of] any improvements *** at a future date;

4. All contractors *** be fully insured and bonded and [the Picernos' insurance policy] name the Association, managing agent, and Board as additional insured[s];

5. Your clients obtain written consent of all other Unit Owners on their floor ***;

6. Your clients submit *** [a draft amendment to the condominium declaration to combine the units into a single unit];

7. Your clients execute a license agreement *** regarding the exclusive use of the Common Element hallway space ***; [and]

8. Your clients pay all legal fees and costs (and engineering fees and costs) expended by the Association relating to the Board's approval of the improvements and license agreement."

¶ 9    Apparently through conversation or correspondence that was not included in the record on appeal, the board subsequently specified that the amount the Picernos were expected to permanently escrow to remediate their modifications to the property was $6,000 and the license fee for use of the common element space was $150 per month " 'with percentage increases mirroring any percentage increase in the budget.' " These dollar amounts appear in the Picernos' complaint for declaratory judgment filed in September 2009 and the condominium association did not dispute them in its answer to the complaint.

¶ 10    In this declaratory judgment action, the parties maintained their respective interpretations of the terms of the condominium declaration and statute; and the Picernos prevailed (a) against a motion to dismiss the pleading, (b) against a motion to dismiss Michael Picerno's affidavit in support of the Picernos' motion for summary judgment, and (c) on cross-motions for summary judgment. The Picernos argued in their motion for summary judgment that the section of hallway they wanted to enclose was not "necessary or practical for use" by the owners of any other units and that the association had unreasonably withheld approval of the application for "unit combination." The judgment order essentially granted the relief sought in the complaint for declaratory judgment and specified:

"1. Consistent with the contractor proposal dated August 8, 2008, Plaintiffs are permitted to combine the units by installing a common front door, at their expense.

2. The work shall not begin until a permit is issued by the City of Chicago.

3. The door will be the same manufacturer and model as the existing door. In the event the same door manufacturer and model is not available, the replacement door shall be substantially similar to the existing door.

4. All drywall/trim/paint will match the existing hallway.

5. At Plaintiffs' cost, and consistent with Sec. 31 of the Act, Plaintiffs' attorney must prepare an amendment to the condominium declaration for approval by the Association which describes the unit combination, and incorporates a portion of the common element hallway as a limited common element for Plaintiffs' use."

¶ 11    On December 2, 2010, the circuit court denied the association's motion to stay the

-4-

judgment pending appeal, but entered a written order stating in part, "Plaintiffs agree to restore the premises at issue in this lawsuit to the original configuration at their expense if this matter is reversed on appeal."

¶ 12    In this appeal, the association contends that by reapportioning some of the common elements for exclusive use by the Picernos, the circuit court diminished all the other unit owners' interests in 1400 Museum Park and that the so-called *de minimus* taking of the common element hallway was in disregard of section 4(e) of the Act and based on a misinterpretation of section 31 of the Act and section 11(a) of the condominium declaration. 765 ILCS 605/4(e), 31 (West 1998). The Picernos respond that section 4(e) is a general statute regarding ownership in the common elements, but section 31 specifically addresses unit combinations and their permissible impact on the use of common elements, and that the court simply followed a sound rule of statutory construction by giving specific statutory language precedence over more general language on the same topic. 765 ILCS 605/4(e), 31 (West 1998). For the following reasons, however, we find the association's argument compelling.

¶ 13    Summary judgment is properly entered if the pleadings, deposition transcripts, affidavits, and any admissions on file show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Huskey v. Board of Managers of Condominiums of Edelweiss, Inc.*, 297 Ill. App. 3d 292, 696 N.E.2d 753 (1998). A controversy regarding the rights of a condominium unit owner in a condominium requires us to examine any relevant portions of the Act and the declaration or bylaws and construe them as a whole. *Carney v. Donley*, 261 Ill. App. 3d 1002, 1008, 633 N.E.2d 1015, 1020 (1994). Moreover, we are to presume "that statutes which relate to the same subject are governed by one spirit and a single policy and that the legislature intended the enactments to be consistent and harmonious." *Schaumburg State Bank v. Bank of Wheaton*, 197 Ill. App. 3d 713, 720, 555 N.E.2d 48, 52 (1990); *Knolls Condominium Ass'n v. Harms*, 202 Ill. 2d 450, 458-59, 781 N.E.2d 261, 267 (2002) ("A court presumes that the legislature intended that two or more statutes which relate to the same subject are to be read harmoniously so that no provisions are rendered inoperative.").

¶ 14    It is undisputed that the portion of the hallway the Picernos have apparently incorporated within their units pursuant to the circuit court order is part of the common elements and thus owned by all the unit owners of 1400 Museum Park. As the association argues, it is well settled that an enclosure which gives the Picernos exclusive use and prevents all the other unit owners from using common elements to which they previously had access diminishes the ownership interests of the others. In our opinion, this is plainly problematic as well as contrary to section 4(e) of the Act, which "expressly provides that once the percentage of ownership interest in the common elements has been determined [and stated in the condominium declaration], that percentage remains constant absent an agreement by all unit owners." *Huskey*, 297 Ill. App. 3d at 294, 696 N.E.2d at 754; 765 ILCS 605/4(e) (West 1998). As explained in *Huskey*, "the legislature deemed consent of all unit owners necessary when changes are made in the percentage of common interest ownership in order to avoid unfairness to minority owners." *Huskey*, 297 Ill. App. 3d at 295, 696 N.E.2d at 755. "Common interest ownership goes to the essence of an owner's property interest in the

condominium. The percentage of common interest ownership impacts the unit's owner's property taxes, the amount of annual and special assessments, as well as the resale price of the unit." *Huskey*, 297 Ill. App. 3d at 295-96, 696 N.E.2d at 755. Paragraph 4(b) of the 1400 Museum Park condominium declaration states, "Each Unit Owner shall own an undivided interest in the Common Elements, in the percentage set forth in Exhibit 'B' attached hereto and made a part hereof, as a tenant in common with all the other Unit Owners." Exhibit B to the recorded condominium declaration is a 12-page list designating the respective interest appurtenant to each dwelling unit and each parking space. For instance, the percentage of common ownership associated with unit 2301 is 0.5195%, unit 2310's is 0.3496%, and each parking space in the building is 0.0300%. The listed percentages of common ownership for the dwelling units and parking spaces in the building add up to "100.0000%." Paragraph 10 of the declaration states in pertinent part: "It is understood that real estate taxes are to be separately taxed to each Unit Owner for his Unit and its corresponding percentage of ownership of the Common Elements, as provided in the Act." Nothing in the record or the appellate briefs suggests that the Picernos sought the consent of all the other unit owners in the building in accordance with section 4(e) or that the Picernos adhered to the board's conclusion that the Picernos had to compensate the other unit owners on a monthly basis for their exclusive use of the common element property and permanently escrow remediation funds.

¶ 15    The exact amount of space at issue is unclear, but it has been described as just "a few" or as much as 8 feet in length and approximately 32 or 64 square feet. A comparably small amount of space was at issue in *Stuewe*, in which a condominium developer realized while closing on the sale of a unit to James and Phyllis Lauletta that the developer could not convey two indoor parking spaces as contracted and so created a new outdoor parking area for the Laulettas by removing shrubs from a portion of the common element grounds. *Stuewe v. Lauletta*, 93 Ill. App. 3d 1029, 1030, 418 N.E.2d 138, 139-40 (1981). The Laulettas' new parking area was located at the front of the building and did not appear on the survey recorded with the condominium declaration. *Stuewe*, 93 Ill. App. 3d at 130, 418 N.E.2d at 139. A few months later, the condominium association took over management of the building and offered the Laulettas a parking space at the rear of the building for their second car, which they refused. *Stuewe*, 93 Ill. App. 3d at 1030, 418 N.E.2d at 140. The condominium declaration specified that each unit had a perpetual and exclusive easement over its parking space(s). *Stuewe*, 93 Ill. App. 3d at 1031, 418 N.E.2d at 140. Therefore, for all practical purposes, no other tenant could use another's assigned space and the particular parking space would pass along with the unit if there was any change in unit ownership. *Stuewe*, 93 Ill. App. 3d at 1031, 418 N.E.2d at 140. The developer's accommodation of the Laulettas' second car diminished the common elements as to all other unit owners. *Stuewe*, 93 Ill. App. 3d at 1031, 418 N.E.2d at 140. Like the condominium declaration and statutory terms which govern 1400 Museum Park, the *Stuewe* condominium declaration stated:

"Each owner shall own an undivided interest in the common elements as a tenant in common with all the other owners of the property ***.

The extent or amount of such ownership (in the common elements) shall be expressed by a percentage amount, and, once determined, shall remain constant, and may

-6-

not be changed without unanimous approval of all owners." (Internal quotation marks omitted.) *Stuewe*, 93 Ill. App. 3d at 1031, 418 N.E.2d at 140.

¶ 16 The developer was bound by these terms, but never followed the procedure for amending the condominium declaration to legally provide for the new parking space. *Stuewe*, 93 Ill. App. 3d at 1030, 418 N.E.2d at 140. Instead, the developer executed a 99-year lease with the Laulettas at closing with a covenant to record an easement. *Stuewe*, 93 Ill. App. 3d at 1030, 418 N.E.2d at 139. The court found that the Laulettas had attempted to purchase or lease a parking space which the developer did not own and which it had no right to control and that the disputed parking space remained part of the common elements. *Stuewe*, 93 Ill. App. 3d at 1031, 418 N.E.2d at 140. The court rejected the contention that it was inequitable to deprive the Laulettas of the space they contracted for, reasoning:

> "It is axiomatic that equity follows the law [citations] and cannot be invoked to destroy or supplant a legal right. It therefore follows that where the Declaration establishes the rights inherent in unit ownership and provides for the procedures in order to effect an amendment to it, equity cannot aid in effecting what ought to have been done, in contravention of the Declaration, particularly when other unit owners' rights are involved. Whether the Declaration was properly amended to provide for the disputed parking space is not an equity question but a question of law controlled by the provisions of the Declaration." *Stuewe*, 93 Ill. App. 3d at 1032, 418 N.E.2d at 141.

¶ 17 *Sawko* is another case involving exclusive use of a small piece of the common elements. *Sawko v. Dominion Plaza One Condominium Ass'n No. 1-A*, 218 Ill. App. 3d 521, 578 N.E.2d 621 (1991). In *Sawko*, the condominium association used common funds to buy a nearby parking garage in the interest of all the condominium owners, and thus expanded the common elements, but the board decided to assign specific parking spaces to some of the unit owners, purportedly to accommodate disabled access. *Sawko*, 218 Ill. App. 3d 521, 578 N.E.2d 621. The condominium declaration authorized the board, at any meeting called for that purpose, when there was a quorum present, to adopt reasonable rules and regulations covering topics including use of the property's parking space. *Sawko*, 218 Ill. App. 3d at 527, 578 N.E.2d at 625. When a disgruntled unit owner sued complaining of this and other board actions, the court indicated the board lacked authority to grant exclusive use and preclude an owner from using a portion of the common elements to which he previously had had access. *Sawko*, 218 Ill. App. 3d at 529, 578 N.E.2d at 627. Excluding the plaintiff from certain parking spaces was improper because it diminished his interest in the common elements and the declaration did not permit this to occur without the unanimous consent of all the condominium association members. *Sawko*, 218 Ill. App. 3d at 530, 578 N.E.2d at 627.

¶ 18 We have also taken into account *Carney*, which involved a cluster of four-story condominium buildings and the property's common room and patio, which had an unobstructed view of a lake. *Carney*, 261 Ill. App. 3d at 1010, 633 N.E.2d at 1021. The condominium board gave permission to three lakeside unit owners to extend their 5-foot balconies 10 feet toward the lake. *Carney*, 261 Ill. App. 3d at 1004, 633 N.E.2d at 1017. One of the other unit owners complained that the balcony extensions, or what the appellate court referred to as the creation of sundecks, required breaking out some of the concrete in the common area in order to drive in new support poles, and that the new, larger platforms would

-7-

overhang the common element patio. *Carney*, 261 Ill. App. 3d at 1004, 633 N.E.2d at 1017. Consistent with the authority we set out above, the court determined the construction diminished the plaintiff owner's interests in the common areas and that this change required unanimous approval of all unit owners. *Carney*, 261 Ill. App. 3d at 1008, 633 N.E.2d at 1020.

¶ 19    Despite this authority and the language of section 4(e) of the Act (765 ILCS 605/4(e) (West 1998)) and paragraph 4(b) of the 1400 Museum Park condominium declaration indicating exclusive use improperly diminishes the ownership interests of the excluded owners and must receive unanimous consent, there is no evidence in the record that the Picernos sought the necessary approval for their hallway enclosure.

¶ 20    Furthermore, the authority the Picernos relied upon did not authorize their actions. We must harmonize section 4(e) of the Act and paragraph 4(b) of the condominium declaration with paragraph 11(a) of the declaration, which addresses unit combinations and subdivisions and was cited in the Picernos' correspondence to the board. *Carney*, 261 Ill. App. 3d at 1008, 633 N.E.2d at 120 (indicating the Act and declaration or bylaws must be construed as a whole). The relevant subparagraph of paragraph 11(a) states:

"A Dwelling Unit may be subdivided or combined by the Unit Owner at such Unit Owner's sole cost and expense in accordance with the Act, the rules and regulations of the Association and upon such conditions as shall be reasonably determined by the Board. That part of the Common Elements separating any two or more adjoining Dwelling Units being combined may be altered to afford ingress and egress to and from such adjoining Dwelling Units and Common Elements may be relocated to portions of a Dwelling Unit being subdivided into separate Dwelling Units, provided that a Unit Owner intending to combine or subdivide its Dwelling Unit(s) and so alter the Common Elements as aforesaid shall make a written application to the Board in conformance with the Act at least 21 days prior to the commencement of any such alteration. The Board's approval of any such Unit Owner's written application to subdivide or combine its Dwelling Unit shall not be unreasonably withheld. However, in the event a Unit Owner of any combined Dwelling Unit wishes to subdivide its combined Dwelling Unit, such Unit Owner shall be required to return certain portions of the combined Dwelling Unit to the Common Element so that the subdivided Dwelling Units conform to the original plans and specifications as created by [developer] Papageorge-Haymes, Ltd. for such Dwelling Units as separate units."

¶ 21    We find that the Picernos misconstrued paragraph 11(a) when they argued it entitled them to convert part of the common element hallway to a limited common element foyer accessible only within the confines of dwelling units 2310 and 2301. The "Common Elements" referred to in paragraph 11(a) as "separating any two or more adjoining Dwelling Units" are those that "may be altered to afford ingress and egress to and from such adjoining Dwelling Units." This description plainly applies only to the walls between adjoining dwelling units. It does not apply to the open hallway on the twenty-third floor that already "afford[ed] ingress and egress to and from" units 2310 and 2301. There is nothing about the open space of the hallway that would need to be "altered" to allow the Picernos to traverse from one unit to the other. The subsequent language of paragraph 11(a) regarding a unit

owner who intended to "alter the Common Elements *as aforesaid*" does not apply to the Picernos' intention to enclose the hallway, nor does the sentence indicating the "Board's approval of *any such Unit Owner's* written application \*\*\* shall not be unreasonably withheld." (Emphasis added.) Arguably, only the generally worded first and last sentences of this paragraph are pertinent to the situation created by the Picernos. The first sentence indicates the Picernos must bear all the "cost and expense" of their modifications and that the changes can proceed only "in accordance with the Act, the rules and regulations of the Association and upon such conditions as shall be reasonably determined by the Board." The last sentence indicates that when the Picernos eventually wish to subdivide the combined units, they "shall be required" to restore the property to the developer's "original plans and specifications."

¶ 22    In light of paragraph 11(a) and the fact that the renovation diminished the interests of the other unit owners, we find that seven of the eight conditions proposed by the board in August 2009 were reasonable, in that they protected the interests of the other unit owners. These conditions included gaining a second architect's opinion, using insured and bonded trades to perform the construction work, covering the association's expenses and naming it as an additional insured, drafting a condominium declaration amendment which described the changes, licensing rather than buying the property outright, and escrowing funds to pay for restoring the property to its original state. The only condition we take issue with is the fifth one, "Your clients obtain written consent of all other Unit Owners on their floor," because we could not find any language in the 1400 Museum Park condominium declaration or the statute which limited the necessary consent to the board and the owners of units on just the twenty-third floor. In our opinion, the fifth condition did not go far enough. As we explained above, access to any part of the common elements can be cut off only with the unanimous approval of *all* unit owners of 1400 Museum Park. *Sawko*, 218 Ill. App. 3d at 529, 578 N.E.2d at 627 (indicating it was beyond the board's authority to grant exclusive use of certain parking spaces in the new garage and preclude the plaintiff unit owner from using a portion of the common elements that were previously accessible to him). To effect an amendment to the declaration, the board must follow the provisions of the Act and any other procedure will be ineffective. *Huskey*, 297 Ill. App. 3d at 296, 696 N.E.2d at 755. The unit owners may, of course, agree to amend their declaration to permit some or all of the conditions proposed by the board; however, unless that happens, the board's approval would be improper and ineffective. *Huskey*, 297 Ill. App. 3d at 296, 696 N.E.2d at 755.

¶ 23    The Picernos acknowledge that section 4(a) prevents an association board from affecting any owner's percentage interest in the common elements without unanimous owner approval (765 ILCS 605/4(e) (West 1998)), but they contend this "fundamental precept of Illinois condominium law \*\*\* simply has no relevance to the case at bar." The Picernos argue that combining their two corner units with a common foyer was fully authorized by the only applicable provision of the Act, section 31. 765 ILCS 605/31 (West 1998). They also contend we should not violate the basic rule of statutory construction that a statute's words, clauses, or sentences are to be given some reasonable meaning and, to the extent possible, no statutory language is rendered superfluous or meaningless. *Huskey*, 297 Ill. App. 3d at 295, 696 N.E.2d at 755. They also emphasize that where two statutory provisions cover the same

subject matter, the more specific statute governs. *Huskey*, 297 Ill. App. 3d at 295, 696 N.E.2d at 755; *Knolls*, 202 Ill. 2d at 459, 781 N.E.2d at 267 ("It is also a fundamental rule of statutory construction that where there exists a general statutory provision and a specific statutory provision, either in the same or in another act, both relating to the same subject, the specific provision controls and should be applied."). The association responds that section 31 of the Act properly applies only when the combining of units does not affect the percentage of ownership interest in the common elements, such as when units are connected by removing all or part of the wall that divides them.

¶ 24 Section 31 states:

"Subdivision or combination of units. Unless the condominium instruments expressly prohibit the subdivision or combination of any units, and subject to additional limitations provided by the condominium instruments, the owner or owners may, at their own expense, subdivide or combine and locate or relocate common elements affected or required thereby, in accordance with the provisions of the condominium instruments and the requirements of this Act. The owner or owners shall make written application to the board of managers, requesting an amendment to the condominium instruments, setting forth in the application a proposed reallocation to the new units of the percentage interest in the common elements, *** if any, previously assigned to the *** new unit or to fewer than all of the new units created and requesting, if desired in the event of a combination of any units, that the new unit be granted the exclusive right to use as a limited common element a portion of the common elements within the building adjacent to the new unit. If the transaction is approved by a majority of the board of managers, it shall be effective upon (1) recording of an amendment to condominium instruments in accordance with the provisions of Sections 5 and 6 of this Act, and (2) execution by the owners of the units involved. In the event of a combination of any units, the amendment may grant the owner of the combined unit the exclusive right to use, as a limited common element, a portion of the common elements within the building adjacent to the new unit. The request for the amendment shall be granted and the amendment shall grant this exclusive right to use as a limited common element if the following conditions are met:

(1) the common element for which the exclusive right to use as a limited common element is sought is not necessary or practical for use by the owners of any units other than the owner or owners of the combined unit; and

(2) the owner or owners of the combined unit are responsible for any and all costs associated with the renovation, modification, or other adaption performed as a result of the granting of the exclusive right to use as a limited common element." 765 ILCS 605/31 (West 1998).

¶ 25 The Picernos conclude that pursuant to section 31, an application to combine adjoining condominium units "shall" (must) be granted by the board as long as the limited common elements that will be used as part of the unit combination are "not necessary or practical for use by the owners of any units other than the owner or owners of the combined unit" (765 ILS 605/31 (West 1998)), and that the circuit court correctly found that the terminating section of hallway was not "necessary or practical for use" by any unit owners but the

Picernos.

¶ 26   In our opinion, however, the interpretation argued by the Picernos is too narrow and fails to give effect to the additional language in section 31 indicating that a proposed renovation is "subject to additional limitations provided by the condominium instruments" and must be accomplished "in accordance with the provisions of the condominium instruments and the requirements of this Act." 765 ILCS 605/31 (West 1998). Furthermore, despite the statement in section 31 that, "If the transaction is approved by a majority of the board of managers, it shall be effective upon (1) recording of an amendment to condominium instruments," paragraph 18 of the declaration stipulates that amendments to certain paragraphs of the declaration require additional approval. Some amendments, for instance, must be approved by "all the members of the Board, all of the Unit Owners and each mortgagee having a bona fide lien of record against any Unit" or must be supported by a document "signed and acknowledged by the President or Vice President and the Secretary or Assistant Secretary of the Association and containing an affidavit by an officer of the Association certifying that (i) at least 67% of the Unit Owners have approved [the change], and (ii) a copy of the amendment, change or modification has been mailed *** to all mortgagees having bona fide liens of record against any Unit."

¶ 27   In short, the Picernos' interpretation would require us to disregard section 4(e) of the Act, a considerable line of authority regarding the other unit owners' interests and rights, and paragraphs 4(b) and 18 of this particular condominium declaration. 765 ILCS 605/4(e) (West 1998). We are confident that this is not what the legislature intended when it enacted section 31.

¶ 28   Given our conclusion that the Picernos have misconstrued section 31, we need not reach their additional contention that the common elements at issue were not "necessary or practical for use" by other unit owners. We express no opinion regarding the meaning of this particular statutory phrase.

¶ 29   We also have no reason to address the association's contention that Michael Picerno's affidavit in support of the Picernos' motion for summary judgment contained unsupported legal conclusions, personal opinions of fact, argument or speculation, and should have been stricken prior to the court's ruling on the cross-motions for summary judgment.

¶ 30   For the reasons stated, we find that the association was entitled to judgment in its favor. Accordingly, we reverse the judgment entered in favor of the Picernos. In light of our conclusions above regarding the conditions proposed by the board in August 2009, in an effort to minimize further, unnecessary litigation and expense to the parties, we direct them to comply with those conditions, with the exception of condition 5, which we have explained must be revised to conform with the Act and the condominium declaration. If the Picernos adhere to the conditions as revised, the board shall recommend that the unit owners and first mortgagees having a *bona fide* lien of record against any unit give approval to the necessary amendment to the condominium declaration. This matter is remanded to the circuit court for further proceedings consistent with these conclusions.

¶ 31   Reversed and remanded with directions.