# Illinois Official Reports

## Appellate Court

---

### *Siena at Old Orchard Condominium Ass'n v. Siena at Old Orchard, L.L.C.*,
### 2017 IL App (1st) 151846

---

| | |
|---|---|
| Appellate Court Caption | SIENA AT OLD ORCHARD CONDOMINIUM ASSOCIATION, an Illinois Not-for-Profit Corporation, and THE BOARD OF DIRECTORS OF THE SIENA AT OLD ORCHARD CONDOMINIUM ASSOCIATION, Plaintiffs-Appellants and Cross-Appellees, v. SIENA AT OLD ORCHARD, L.L.C., an Illinois Limited Liability Company; LENNAR CHICAGO, INC., an Illinois Corporation; and LARRY KEER, Individually, Defendants-Appellees (Siena at Old Orchard, L.L.C.; and Lennar Chicago, Inc., Cross-Appellants). |
| District & No. | First District, Fifth Division<br>Docket No. 1-15-1846 |
| Filed<br>Rehearing denied | March 24, 2017<br>April 24, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-L-8154; the Hon. Patrick J. Sherlock, Judge, presiding. |
| Judgment | Reversed. |
| Counsel on Appeal | Diane J. Silverberg and Jason E. Orth, of Kovitz Shifrin Nesbit, of Mundelein, for appellants.<br><br>E. Michael Ciesla, of Ciesla & Ciesla, P.C., of Northbrook, for appellee Larry Keer. |

Colby A. Kingsbury and Shawn M. Doorhy, of Faegre Baker Daniels LLP, of Chicago, for other appellees.

Panel               PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.
Justices Lampkin and Reyes concurred in the judgment and opinion.

## OPINION

¶ 1      The instant appeal arises from a dispute over construction defects discovered at a condominium complex in Skokie, Illinois. Plaintiffs, Siena at Old Orchard Condominium Association and its board of directors (collectively, the Association), filed suit against the developer, Siena at Old Orchard, L.L.C.; the developer's management company, Lennar Chicago, Inc. (collectively, the developers); and Larry Keer, the president of the Association's initial board of directors. Defendants filed a motion to dismiss the complaint, claiming that the Association had failed to follow the mandatory arbitration requirements contained in the Association's declaration, resulting in waiver of their claims. The trial court granted the motion to dismiss, finding that the Association had waived all claims by failing to abide by the declaration's requirements. The Association appeals the trial court's dismissal of its complaint. The developers cross-appeal, claiming that the trial court did not award them all of the attorney fees and costs to which they were entitled. For the reasons that follow, we reverse.

¶ 2                                  BACKGROUND

¶ 3                                    I. Complaint

¶ 4                                    A. Allegations

¶ 5      On July 17, 2013, the Association filed an eight-count complaint against defendants. The complaint alleges that Siena at Old Orchard, L.L.C., was the developer of Siena at Old Orchard Condominium, a residential condominium complex located in Skokie, and that Lennar Chicago, Inc., was the developer's manager. The Association was established on July 24, 2006, and from its formation until March 2007, it was governed by a board of directors appointed by the developer. In March 2007, control of the Association was transferred from the initial developer-appointed board to a board of directors elected from the unit owner membership. Larry Keer was the president of the Association's board of directors on July 18, 2008.

¶ 6      The complaint alleges that "the common elements of the building are experiencing numerous latent defects in the construction of the common areas for the Association, namely water leaks are entering the interior of the building." The complaint further alleges that the exterior walls were constructed "without the required flashing and weeps" and were also "undergoing severe cracking and deterioration." Finally, the complaint alleges that "an improper water proofing system was utilized."

¶ 7        The complaint alleges that after the turnover, some of the unit owners retained a consultant to investigate the cause of water infiltration problems that were being experienced. During the course of his investigation, "the consultant performed several tests and made exploratory investigations into the common elements of the building to determine the causes of the leaks." The consultant issued a report to the Association in May 2010, identifying "defective" portions of the property, including the asphalt paving, the exterior masonry walls, the masonry expansion joints, and balcony deck membranes. The complaint further alleges that "[t]his is the first time that the post developer Board became aware that there [were] defects at the Association that were attributable to the developer's defective development of the Association." These construction defects were "affecting the structural integrity of the building and its common elements." Furthermore, the complaint alleges, "the manner in which several portions of the building were installed and constructed is contrary to the architectural drawings and specifications prepared for the Association building."

¶ 8        The complaint alleges that prior to the turnover, the developer and the initial board had actual knowledge of the construction defects in the common elements, but that "[t]he unit owner controlled board did not have knowledge of these construction defects until after" the May 2010 report by the Association's consultant. However, despite having knowledge of the construction defects, the developer and the initial board "failed to inform the post developer Board of the fact that the defective conditions at the Association were caused by the defective development, design and construction of the Condominium."

¶ 9        The complaint set forth eight counts. Counts I through IV were applicable to the developers, while counts V through VIII were aimed at Keer. Count I was for breach of fiduciary duty and alleged that the initial developer-appointed board breached its fiduciary duty to the unit owners by failing to properly investigate the complex, failing to ask the developer to remedy the defects, and "otherwise fail[ing] to protect the interests of the Association's members," which the complaint alleged were intentional acts done "for the purpose of increasing and maximizing the Developer's profits in the development and sale of the Complex and units in the Association and to avoid its share of assessment responsibility for reserves and repairs, all to the detriment of the owners in the Association."

¶ 10       Count II was for breach of contract and alleged that the developer failed to construct the condominium complex according to the terms set forth in the purchase agreement. Count III was for breach of the implied warranty of habitability and count IV was for breach of the implied warranty of good workmanship and materials. All of the counts directed at the developers sought damages "in an amount equal to the total cost of repair or replacement of the aforesaid defects," which the complaint alleged "is believed to be in excess of $500,000.00."

¶ 11       Counts V through VIII were directed at Keer, who was the president of the Association on July 18, 2008, when he executed a release[1] "that indicated that the Association was releasing its claims against the developer purportedly on behalf of the Association." However, the complaint alleged that Keer did not have the authority to sign documents on behalf of the Association without the approval of the majority of the board, which he did not have at the time of the signing of the release. Accordingly, the complaint set forth two counts for breach of

_____

[1]Two of the counts refer to a release executed on July 18, 2008, while the other two counts refer to a release executed on October 30, 2008.

- 3 -

fiduciary duty and two counts of constructive fraud.

¶ 12                          B. Declaration of Condominium Ownership

¶ 13        Attached to the complaint was the declaration of condominium ownership for Siena at Old Orchard Condominium, recorded on July 24, 2006. Article 12 of the declaration was titled "Dispute Resolution," and contained five sections. Section 12.01 was titled "Consensus for Action by the Condominium Association" and provided that, "[e]xcept as provided in this Section, the Condominium Association may not commence a legal proceeding or an action under this Article without the affirmative vote of at least seventy-five percent (75%) of the Voting Members." Section 12.01 further provided that "[p]rior to the Condominium Association or any member commencing any proceeding to which Declarant[2] is a Party, including but not limited to an alleged defect of any improvement, Declarant shall have the right to be heard by the members, or the particular member, and to access, inspect, correct the condition of, or redesign any portion of any improvement as to which a defect is alleged or otherwise correct the alleged dispute."

¶ 14        Section 12.02 was titled "Alternative Method for Resolving Disputes" and provided, in full:

> "Declarant, its officers, directors[,] employees and agents; the Condominium Association, its officers, directors and committee members; all Persons subject to this Declaration; and any Person not otherwise subject to this Declaration who agrees to submit to this Article (each such entity being referred to as a 'Bound Party') agree to encourage the amicable resolution of disputes, without the emotional and financial costs of litigation. Accordingly, each Bound Party covenants and agrees to submit those Claims, grievances or disputes described in Section 12.03 (collectively, 'Claims') to the procedures set forth in Section 12.04."

¶ 15        The "Claims" referred to in section 12.02 of the declaration were set forth in section 12.03, which was titled "Claims." Section 12.03 provided, in relevant part:

> "[A]ll claims between any of the Bound Parties regardless of how the same might have arisen or on what it might be based, including but not limited to Claims (a) arising out of or relating to the interpretation, application or enforcement of the provisions of the Act, this Declaration, the By-Laws and reasonable rules and regulations adopted by the Board or the rights, obligations and duties of any bound Party under the provisions of the Act, this Declaration, the By-Laws and reasonable rules and regulations adopted by the Board, (b) relating to the design or construction of improvements; or (c) based upon any statements, representations, promises, warranties, or other communications made by or on behalf of any bound Party shall be subject to the provisions of Section 12.04."

¶ 16        Section 12.04, which was titled "Mandatory Procedures," set forth the procedure the parties agreed to follow in the event a claim arose. Specifically, section 12.04(a) was titled "Notice" and provided:

> "As a condition precedent to seeking any action or remedy, a Bound Party having a Claim ('Claimant') against any other Bound Party ('Respondent') (the Claimant and the Respondent referred to herein being individually, as a 'Party,' or, collectively, as

---

[2] "Declarant" was the developer, according to the declaration's definitions section.

the 'Parties') shall notify each Respondent in writing (the 'Notice'), stating plainly and concisely:

(i) the nature of the Claim, including the defect or default, if any, in detail and the Persons involved and the Respondent's role in the Claim;

(ii) the legal basis of the Claim (*i.e.*, the specific authority out of which the Claim arises);

(iii) the proposed remedy;

(iv) any evidence that depicts the nature and cause of the Claim and the nature and extent of repairs necessary to remedy the Claim, including expert reports, photographs and videotapes; and

(v) the fact that Claimant will meet with Respondent to discuss in good faith ways to resolve the claim.

Notices given to Respondent pursuant to this Section shall be deemed sufficient if personally delivered, delivered by commercial messenger service, or mailed by registered or certified mail, postage prepaid, return receipt requested to the last known address of the Respondent as it appears on the records of the Condominium Association on the date of mailing."

¶ 17    Section 12.04(b), titled "Claims Involving Declarant," provided additional rights for the Declarant developer. These provisions included that: "Claimant agrees to permit Declarant and its agents to perform inspections and tests and to make all repairs and replacements deemed necessary by Declarant to respond to the claim," and "Declarant or Condominium Association, as the case may be, shall have not less than 35 days nor more than 90 days from receipt of the Notice (the 'Cure Period') to cure as provided herein or to otherwise respond to the Claimant in the event that the Declarant determines that no default has occurred and/or default exists." The provision provided that "Declarant shall have the right, but not the obligation, to take action during the Cure Period and/or respond to any notice received from Claimant."

¶ 18    Section 12.04(b)(iv), titled "Dispute Resolution," then provided:

"Any dispute (whether contract, warranty, tort, statutory or otherwise) including, but not limited to (a) any and all controversies, disputes or claims arising under, or related to, the Purchase Agreement, the Unit, or any dealings between the Declarant and Owner ***, (b) any controversy, dispute or claim arising by virtue of any representations, promises or warranties alleged to have been made by Declarant or Declarant's representative, and (c) any personal injury or property damage alleged to have been sustained by Purchaser on the Property (hereinafter individually and collectively referred to as 'disputes' or 'Claims'), shall first be submitted to mediation and, if not settled during mediation, shall thereafter be submitted to binding arbitration as provided in Paragraphs 12.04(c) and 12.04(d) below and as provided by the Federal Arbitration Act (9 U.S.C. Section 1 *et seq.*) or applicable state law relating to arbitration and not by or in a court of law."

¶ 19    Section 12.04(c), titled "Negotiation and Mediation," provided under subsection (ii), in relevant part, "If the Parties do not resolve the Claim within 90 days after the date of the Notice and the Cure Period has expired (or within such other period as may be agreed upon by the Parties) ('Termination of Negotiations'), either Party shall have 30 days from the date of Termination of Negotiations to submit the claim to mediation." Subsection (iii) stated that "[i]f

a Claimant does not submit the Claim to mediation within such time, or does not appear for the mediation, then the Claimant shall be deemed to have waived the Claim, and the Respondent shall be released and discharged from any and all liability to Claimant on account of such Claim."

¶ 20    Section 12.04(e), titled, "Costs and Expenses" provided, in full,

"Except as otherwise provided under subparagraph 12.04(b) above, each Party shall bear its own costs and expenses, including attorney's fees, for any mediation and arbitration. Notwithstanding the foregoing, if a Party unsuccessfully contests the validity or scope of arbitration in a court of law, the non-contesting Party shall be awarded reasonable attorneys fees and expenses incurred in defending such a contest. In addition, if a Party fails to abide by the terms of a mediation settlement or arbitration award, the other Party shall be awarded reasonable attorneys fees and expenses incurred in enforcing such a settlement or award."

¶ 21    Section 12.05, titled "Amendment of Article," stated in full, "Without express prior written consent of Declarant, this Article may not be amended for a period of twenty years from the effective date of this Declaration."

¶ 22    Attached as an exhibit to the declaration was the Association's bylaws. Section 5.10 of the bylaws provided that, "[e]xcept as otherwise expressly provided herein or in the Declaration, any action may be taken upon the affirmative vote of a majority of the Directors present at a meeting at which a quorum is present." Furthermore, section 8.01 discussed authority for the execution of instruments:

"EXECUTION OF INSTRUMENTS: The Board may authorize any officer or officers, agent or agents of the Condominium Association, in addition to the officers so authorized by these By-Laws, to enter into any contract or execute and deliver any instrument (including amendments to the Declaration or these By-Laws which must be executed by the Condominium Association) in the name of and on behalf of the Condominium Association and such authority may be general or confined to specific instances. In the absence of any such authorization by the Board, any such contract or instrument shall be executed by the President or a Vice President and attested to by the Secretary or an Assistant Secretary of the Condominium Association."

¶ 23    Finally, included within the declaration is a document titled "Amendment of the Declaration of Condominium Ownership for Siena Old Orchard Condominium Association." Pursuant to the amendment, article 12 of the declaration was deleted in its entirety. The amendment stated: "[T]he following Amendment has been approved by the affirmative vote of Voting Members having no less than sixty-seven percent (67%) of the owners as evidenced by the Certification attached hereto ***." The document was signed by the president of the Association and dated August 14, 2011.

¶ 24                               C. Real Estate Purchase Agreement

¶ 25    Also attached to the complaint was the "Real Estate Purchase Agreement" for the purchase of a unit within the condominium building, executed by the developer and Larry and Theresia Keer,[3] dated June 24, 2006. The agreement contains a section titled, "Seller's Limited

---

[3]The record does not disclose Theresia Keer's relationship to defendant Keer, but we presume she is his spouse.

Warranty/Waiver of Implied Warranty of Habitability." The language stated, in all capital letters, "seller hereby disclaims and purchaser hereby waives the implied warranty of habitability described above." The agreement further stated, "if a dispute arises with seller and if a dispute arises with seller and the dispute results in a lawsuit, purchaser will not be able to rely on the implied warranty of habitability described above as a basis for suing the seller." In an addendum to the agreement, a clause was added that stated, "Purchasers agree that in consideration for Seller providing Purchaser with Limited Warranties, Purchaser will accept the Limited Warranties as a substitute for the Implied Warranty of Habitability." The addendum additionally stated, in all capital letters: "if a dispute arises with seller and the dispute results in a lawsuit, purchaser will not be able to rely on the implied warranty of habitability described above as a basis for suing the seller. Purchaser may, however, rely on the limited warranties made by seller to purchaser." Larry Keer's and Theresia Keer's initials are located under both of these sections. The document is followed by a document titled, "Siena Condominium Unit Warranty." Though the document failed to identify the parties, the agreement provided the purchaser with a limited warranty of one year after the closing date. Section 8 of the agreement required the parties to submit all claims to mediation and binding arbitration. The warranty is not dated or signed.

¶ 26                                                    D. Releases

¶ 27        Additionally attached to the complaint are the two releases referred to in counts V through VIII of the complaint against Keer. The Association, represented by Keer, and the developer executed the documents on July 18, 2008, and October 30, 2008. According to the releases, which contained identical language, "[t]he Association *** made various claims against the Developer including, among other things, the 'Items' on the Punch list attached hereto as Exhibit A," which included problems such as broken concrete in the parking lot and improper placement of the wood trim in the hallways,[4] and "[t]he parties desire to resolve the claims made by the Association and any and all other future claims or causes of action." Accordingly, the developer agreed to pay the Association $20,734 in the July 18, 2008, release and agreed to pay $7779.53 in the October 30, 2008, release. In exchange, the Association agreed to release and discharge the developer from:

> "any and all claims, causes of action, or liabilities whosoever, known or unknown, asserted or unasserted, whether arising out of contract, tort, or otherwise, in law or in equity arising, accruing, or based on any action or inaction of any such parties, including, without limitation, any claim for construction defects in connection with the construction of the improvements which are part of the Condominium, the administration of the Association prior to the turnover of control to a board of directors elected by the unit owners and the payment of assessments, charges or other amounts whatsoever due to the Association from the Developer."

---

[4]"Exhibit A" was identical in both releases, except that in the exhibit attached to the October 30, 2008, release, there was an additional item that provided that, "[a]s a result of [water-seepage issues due to the pitch of the garage floor], the elevator system control sustained $20,734 of damage." The "status" of this item provided that "[the developer] has reimbursed the [Association] for the cost of the repairs." We note that the $20,734 listed as the amount of damage is also the precise amount the developer agreed to pay in the July 18, 2008, release.

¶ 28    The developer agreed to release the Association from "any and all claims and causes of action or liabilities whatsoever, known or unknown, asserted or unasserted, whether rising out of contract, tort, or otherwise in law or in equity, arising, accruing, or based on any action of the Association or its directors, officers, or agents." Defendant Lennar Chicago, Inc., through its vice president, Glenn V. Richmond, signed the releases on behalf of the developer, while defendant Larry M. Keer signed on behalf of the Association.

¶ 29                                II. Motions to Dismiss

¶ 30    On August 28, 2013, Keer filed a motion to dismiss the Association's complaint pursuant to section 2-619 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619 (West 2012)). On October 9, 2013, the developers filed a motion to dismiss the Association's complaint pursuant to section 2-615 of the Code (735 ILCS 5/2-615 (West 2012)). These two motions contained identical arguments despite the fact they were seeking dismissal pursuant to different sections of the Code. The developers and Keer argued article 12 of the declaration deprived the court of jurisdiction and required the parties to submit the dispute to arbitration. In response, the Association argued that, prior to filing this lawsuit, the board amended article 12 to delete the article in its entirety. On February 13, 2014, the trial court granted the motions to dismiss and dismissed the Association's complaint without prejudice. The court relied on section 12.05 of the declaration, which required express written consent from the developer prior to an amendment of the declaration, to find that the amendment removing article 12 was not valid.

¶ 31    On February 26, 2014, the Association filed a motion to reconsider the trial's order, based on an error in the court's previous application of existing law. The Association argued that the amendment removing article 12 was proper pursuant to section 27(a)(i) of the Condominium Property Act (Act) (765 ILCS 605/27(a)(i) (West 2012)), which provides that the "only" basis for amendment to a declaration is "upon the affirmative vote of ⅔ of those voting" and that "in no event shall the condominium instruments require more than a three-quarters vote of unit owners." The Association argued that pursuant to the Act, section 12.05, which required the developer's consent prior to an amendment, was invalid. The Association also argued that section 32 of the Act should be interpreted to permit mandatory arbitration only in matters below $10,000 in dispute and, since the instant dispute had a higher value, the mandatory arbitration requirement in article 12 was invalid. In response, the developers argued that the Association waived these arguments by failing to bring this law to the court's attention during the pendency of the motions to dismiss.

¶ 32    On May 8, 2014, the trial court granted the Association's motion to reconsider, based on an error in the court's previous application of existing law.[5] The trial court held that section 27 of the Act invalidated section 12.05 of the declaration, since the only means to amend a declaration was through a ⅔ vote and section 12.05 sought to impose an additional requirement, namely, the developer's consent to the amendment. As such, the board's vote to amend and delete article 12 of the declaration was proper, and the parties were not required to submit the claim to arbitration. However, the court rejected the Association's argument under section 32 of the Act. The court found that section 32 cannot be interpreted to permit

_____

    [5]Although the trial court stated that the motion was based on an error in the previous application of the law, the trial court had not previously applied section 27 or section 32 of the Act granting the motions to dismiss.

- 8 -

mandatory arbitration only in disputes involving less than $10,000, as this interpretation was unsupported by case law and contrary to the plain meaning of the Act. The court also found this interpretation of section 32 violated the Illinois public policy favoring the enforcement of arbitration and mediation agreements.

¶ 33                     III. Amended Complaint and Motion to Dismiss

¶ 34    On May 29, 2014, the Association filed an amended complaint, and defendants again filed motions to dismiss the amended complaint, with Keer filing a motion to dismiss under section 2-619 of the Code and the developers filing a combined motion to dismiss under section 2-619.1 of the Code (735 ILCS 5/2-619.1 (West 2012)). While the motions to dismiss were pending, the Association sought leave to file a second amended complaint, claiming that the section 2-615 portion of the developers' motion to dismiss raised pleading deficiencies that the Association sought to amend through the filing of a second amended complaint; the Association claimed that "[a]llowing this amendment would permit the hearing of all issues raised, both 2-615 and 2-619, issues, at one time and prevent duplicative pleadings and motion practice."

¶ 35    The Association was granted leave to file a second amended complaint, and it filed its second amended complaint on September 10, 2014. The second amended complaint included allegations regarding the board's amendment to delete article 12 of the declaration, which required the parties to submit all claims to arbitration and mediation. These allegations included that the amendment occurred on August 14, 2011, and was properly recorded with the Cook County recorder of deeds office. The amended complaint also alleged that, prior to this amendment, the Association had not sent notice pursuant to section 12.04(a) of the declaration to trigger the mediation and arbitration requirements.

¶ 36    On September 24, 2014, the developers filed a combined motion to dismiss the Association's second amended complaint pursuant to section 2-619.1 of the Code.[6] The developers claimed that prior to the amendment of article 12 of the declaration, the Association sent a letter to the developer that constituted notice to trigger the mediation and arbitration process required by the declaration. The developer argued that, pursuant to section 12.04(c), the Association waived its claims by failing to submit the claims to mediation within the allotted time requirement. The developers also claimed the releases executed by Keer extinguished the cause of action. Further, as to count I for breach of fiduciary duty, the developers argued the count was not sufficiently pled.

¶ 37    The letter, which was attached to the motion to dismiss, was dated August 13, 2010, and signed by an attorney representing the Association. The letter indicated that it had been sent via email and that its subject was "Re: Claim against Developer: Siena at Old Orchard Condominium Association." The letter stated, in full:

> "Please be advised that I represent the Above referenced condominium association relative to its *** claim against the developer for certain construction defects. Attached please find a transition study outlining, in detai[l] the construction and design

---

[6]The record does not show that Keer filed a new motion to dismiss after the filing of the second amended complaint. However, since the second amended complaint sought to remedy only the pleading deficiencies raised by the developers' section 2-615 motion, Keer's section 2-619 motion would have remained pending.

deficiencies. Also please find[ ] [a] 'bid comparison' sheet setting forth bids for correcting some of the work.

> The Association intends on scheduling the work *** in the next two weeks. Accordingly, in order to avoid a claim by the Developer of spoliation of evidence, you are hereby advised that your representatives may inspect/test/photograph the area to be repaired so that evidence may be secured for upcoming litigation. Please contact the undersigned prior to August 30, 2010 in order to avail yourself this opportunity."

In response to the motion to dismiss, the Association claimed that the letter acted only to prevent spoliation and did not conform to the notice requirements under section 12.04(a). As such, the letter did not trigger the mediation and arbitration requirement.

¶ 38    Additionally, attached to Keer's motion to dismiss was a letter sent by the Association to Keer in his capacity as a unit owner on September 16, 2010, which he claimed was an additional way that the Association gave him notice. The letter provided, in relevant part:

> "[T]he purpose of this letter is to clarify facts regarding exterior building issues and what led up to issues of payment for the required work. In the fall of 2009 management brought to Lennar's attention that there were defects to the exterior of the buildings. Two members of Lennar showed up and admitted that indeed it appeared that there was unfinished work done by the contractors regarding the balconies. They said they would come back out the following summer (2010) to discuss scheduling repairs, but would not admit to any other defects.

> But on November 5, 2009 Lennar sent out an email to us (see attachment) and again on August 24, 2010 a letter to our attorneys attaching a Release dated July 2008 and signed by the then Board President Larry Keer. In the Release, in return for approximately $28,500 towards elevator and boiler repairs, Larry Keer signed a Letter of Release that removed Lennar from any further work and held Lennar harmless from further issues. *As a result you will see from the attached documentation, 'Lennar respectively declines any responsibilities for any repairs to the project.[']*

> This was the first time the current Board ever heard or saw of the Release.

> This Release becomes very significant, since in August 2010 the current Board had a transition report completed where it was discovered that substantial work needs to be done to both buildings, amounting to close to $900,000. The Board sought Legal Council [*sic*], where it was learned that because of the Release signed by Larry Keer, the Association would likely lose any lawsuit against the developer[.]

> It should be emphasized that by simply walking around the North building one could have seen cracked and crumbling masonry and unfinished balconies clearly visible to anyone who took the time to look. With such knowledge nobody could possibl[y] have signed the Release, which gave away the Association's ability to seek corrective action by Lennar.

> Knowing that the suit by the Association would be dismissed, the only option open to the Association would be to sue Larry Keer in the hope that the Directors and Officers insurance would kick in to pay for the error made by signing the Release in the first place without having pertinent information regarding the repair costs." (Emphasis in original.)

¶ 39 On November 4, 2014, the parties came before the trial court for a hearing on the developers' motion to dismiss. The trial court found the letter drafted by the Association's attorney constituted notice under section 12.04(a) to initiate the mediation and arbitration process as delineated in article 12 of the original declaration. The trial court also found that the Association waived its claims by failing to submit the claims to mediation as required. The trial court dismissed the Association's second amended complaint with prejudice as to all defendants. On March 3, 2015, the trial court denied the Association's motion to reconsider.

¶ 40 IV. Motion to Recover Costs and Attorney Fees

¶ 41 On December 4, 2014, the developers filed a motion to recover fees and costs and for sanctions pursuant to section 12.04(e) of the declaration and Illinois Supreme Court Rule 137 (eff. July 1, 2013). The Association argued that section 12.04(e) did not apply due to the amendment of the declaration on August 14, 2011. On March 3, 2015, the trial court held that article 12 must be applied in its entirety. Pursuant to section 12.04(e), the developer was titled to recover fees and expenses it incurred in defending the validity of article 12 of the declaration.

¶ 42 On May 27, 2015, the trial court awarded the developers attorney fees in the amount of $106,237.50 and costs in the amount of $700.50. The trial court found recoverable only those fees associated with the defense of article 12 and the mandatory arbitration provisions as proscribed under section 12.04(e). Thus, the court found that the developers could not recover for insurance related matters or for paralegal time that involved general office overhead functions. The developers also could not recover for any matters simply deemed "other tasks." The court held that the large amounts of money claimed were warranted due to the aggressive litigation tactics of the developers and the complexity of the legal issues involved. The trial court additionally awarded defendant Keer attorney fees in the amount of $22,904.50 and costs in the amount of $451.80. Because the trial court awarded fees under section 12.04(e), the trial court denied the developers' motion for sanctions under Illinois Supreme Court Rule 137 (eff. July 1, 2013).

¶ 43 On June 26, 2015, the Association filed a notice of appeal and, on July 8, 2015, the developers filed a notice of cross-appeal.

¶ 44 ANALYSIS

¶ 45 On appeal, the Association raises a number of ways in which it claims that the trial court erred in dismissing its complaint: (1) that the letter sent by the Association's attorney did not constitute "notice" such that it triggered the dispute resolution procedure under article 12 of the declaration; (2) that public policy voided the mandatory mediation and arbitration requirements of article 12 of the declaration; (3) that the releases did not release the Association's claims; and (4) that the second amended complaint stated a cause of action for breach of fiduciary duty. The Association also argues (5) that defendants were not entitled to an award of attorney fees and costs. In their cross-appeal, the developers claim that the trial court erred by (1) declining to award them certain fees and costs and (2) failing to rule on their Rule 137 motion. The developers also claim that the trial court erred in finding that section 27 of the Act invalidated section 12.05 of the declaration. We first consider the parties' arguments concerning the propriety of the dismissal of the complaint and then turn to the consideration of

- 11 -

the award of fees and costs.

¶ 46                                    I. Dismissal of the Complaint

¶ 47    In the case at bar, the trial court dismissed the Association's initial complaint without prejudice under section 2-615 of the Code, but then granted the Association's motion to reconsider, finding that section 12.05 of the declaration, which required the developer's consent to amend the declaration, was inconsistent with section 27 of the Act. After the Association amended its complaint, the trial court dismissed the second amended complaint under section 2-619 of the Code, finding that the Association had waived its claims by failing to abide by the mandatory dispute resolution procedures triggered by its sending notice of its claims to the developers. The trial court then denied the Association's motion to reconsider, which was based on a public policy argument concerning an amendment to the Act.

¶ 48    A section 2-615 motion to dismiss "tests the legal sufficiency of a complaint," while a section 2-619 motion to dismiss "admits the sufficiency of the complaint, but asserts affirmative matter that defeats the claim." *Bjork v. O'Meara*, 2013 IL 114044, ¶ 21. "In ruling on motions to dismiss pursuant to either section 2-615 or 2-619 of the Code, the trial court must interpret all pleadings in the light most favorable to the nonmoving party" (*Doe v. Chicago Board of Education*, 213 Ill. 2d 19, 23-24 (2004)), and a cause of action should not be dismissed under either section unless it is clearly apparent that no set of facts can be proved that would entitle the plaintiff to relief (*Pooh-Bah Enterprises, Inc. v. County of Cook*, 232 Ill. 2d 463, 473 (2009) (section 2-615 motion); *Feltmeier v. Feltmeier*, 207 Ill. 2d 263, 277-78 (2003) (section 2-619 motion)). Our review of a motion to dismiss under either section is *de novo* (*Carr v. Koch*, 2012 IL 113414, ¶ 27), and we may affirm the dismissal of a complaint on any ground that is apparent from the record (*Golf v. Henderson*, 376 Ill. App. 3d 271, 275 (2007)). *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011). Additionally, while the decision to grant or deny a motion to reconsider lies within the discretion of the trial court, " 'where a motion to reconsider raises a question of whether the trial court erred in its previous application of existing law, we review *de novo* the trial court's determinations of legal issues.' " *TCF National Bank v. Richards*, 2016 IL App (1st) 152083, ¶ 41 (quoting *JP Morgan Chase Bank v. Fankhauser*, 383 Ill. App. 3d 254, 259 (2008)).

¶ 49                                    A. Adequacy of Notice

¶ 50    The Association first takes issue with the trial court's finding that the August 13, 2010, letter from its counsel to the developers constituted "notice" so as to trigger the mandatory dispute resolution procedures. "Because many of the facts are not disputed, and because condominium declarations are covenants running with the land, we need only examine the language of the declaration in this case, to the extent the language is unambiguous, to determine whether the trial court acted properly." *Goldberg v. Astor Plaza Condominium Ass'n*, 2012 IL App (1st) 110620, ¶ 48. The construction of condominium declarations is a question of law. *Carl Sandburg Village Condominium Ass'n No. 1 v. Carl Sandburg Village Condominium Homeowners' Ass'n*, 175 Ill. App. 3d 1, 5 (1987). " 'The paramount rule for the interpretation of covenants is to expound them so as to give effect as to the actual intent of the parties as determined from the whole document construed in connection with the

circumstances surrounding its execution.' " *Carney v. Donley*, 261 Ill. App. 3d 1002, 1008 (1994) (quoting *Amoco Realty Co. v. Montalbano*, 133 Ill. App. 3d 327, 331 (1985)).

¶ 51    As an initial matter, the developers claim that this issue has been forfeited because the Association did not raise it until it filed a motion to reconsider the order granting the developers' motion to dismiss. However, we note that the second amended complaint contained an allegation that "prior to the Amendment of the Declaration on or about August 14, 2011, the Association did not provide to any defendant, or any other entity or person, a notice that was in compliance with or pursuant to Section 12.04(1) of the original Declaration." Additionally, the developers argued that the Association had failed to comply with the mandatory arbitration requirements in their motion to dismiss the Association's second amended complaint and, in response, the Association argued that the letter relied upon by the developers did not comply with the declaration's notice requirements so as to trigger the arbitration process. Thus, we find no basis for the developers' argument that this issue has been forfeited on appeal and proceed to consider the merits of the Association's argument.

¶ 52    As noted, section 12.04 of the declaration, which was titled "Mandatory Procedures," set forth the procedure the parties agreed to follow in the event a claim arose. Specifically, section 12.04(a) was titled "Notice" and provided:

"As a condition precedent to seeking any action or remedy, a Bound Party having a Claim ('Claimant') against any other Bound Party ('Respondent') (the Claimant and the Respondent referred to herein being individually, as a 'Party,' or, collectively, as the 'Parties') shall notify each Respondent in writing (the 'Notice'), stating plainly and concisely:

(i) the nature of the Claim, including the defect or default, if any, in detail and the Persons involved and the Respondent's role in the Claim;

(ii) the legal basis of the Claim (i.e., the specific authority out of which the Claim arises);

(iii) the proposed remedy;

(iv) any evidence that depicts the nature and cause of the Claim and the nature and extent of repairs necessary to remedy the Claim, including expert reports, photographs and videotapes; and

(v) the fact that Claimant will meet with Respondent to discuss in good faith ways to resolve the claim.

Notices given to Respondent pursuant to this Section shall be deemed sufficient if personally delivered, delivered by commercial messenger service, or mailed by registered or certified mail, postage prepaid, return receipt requested to the last known address of the Respondent as it appears on the records of the Condominium Association on the date of mailing."

Under section 12.04(c), "[i]f the Parties do not resolve the Claim within 90 days after the date of the Notice and the Cure Period has expired (or within such other period as may be agreed upon by the Parties) ('Termination of Negotiations'), either Party shall have 30 days from the date of Termination of Negotiations to submit the claim to mediation." Additionally, "[i]f a Claimant does not submit the Claim to mediation within such time, or does not appear for the mediation, then the Claimant shall be deemed to have waived the Claim, and the Respondent shall be released and discharged from any and all liability to Claimant on account of such

Claim." Thus, if notice pursuant to section 12.04(a) was sent, and the claim was not submitted to mediation within 30 days after the date of termination of negotiations, the claim would be considered waived. In the case at bar, then, if a notice was sent that triggered the mandatory dispute resolution process, then the Association would be deemed to have waived its claims against defendants, because there is no dispute in the instant case that the Association's claims against defendants were never submitted to mediation.

¶ 53    In the case at bar, the developers argued, and the trial court agreed, that the Association sent the developers notice pursuant to section 12.04(a) when the Association's attorney sent them a letter concerning the Association's claims. The letter was dated August 13, 2010, and was signed by an attorney representing the Association. The letter indicated that it had been sent via email and that its subject was "Re: Claim against Developer: Siena at Old Orchard Condominium Association." The letter stated, in full:

> "Please be advised that I represent the Above referenced condominium association relative to its *** claim against the developer for certain construction defects. Attached please find a transition study outlining, in detai[l] the construction and design deficiencies. Also please find[ ] [a] 'bid comparison' sheet setting forth bids for correcting some of the work.
>
> The Association intends on scheduling the work *** in the next two weeks. Accordingly, in order to avoid a claim by the Developer of spoliation of evidence, you are hereby advised that your representatives may inspect/test/photograph the area to be repaired so that evidence may be secured for upcoming litigation. Please contact the undersigned prior to August 30, 2010 in order to avail yourself this opportunity."

The Association argues that this letter was merely intended to prevent a spoliation of evidence claim and was not "notice" that would trigger the mandatory dispute resolution process.

¶ 54    "The rules of construction for contracts govern our interpretation of the covenants contained in the declaration." *Forest Glen Community Homeowners Ass'n v. Bishof*, 321 Ill. App. 3d 298, 303 (2001); *Stobe v. 842-848 West Bradley Place Condominium Ass'n*, 2016 IL App (1st) 141427, ¶ 13. "The primary rule of interpretation is to give effect to the drafting parties' intent." *Stobe*, 2016 IL App (1st) 141427, ¶ 13. "If the words in the contract are clear and unambiguous, they must be given their plain, ordinary and popular meaning." *Thompson v. Gordon*, 241 Ill. 2d 428, 441 (2011).

¶ 55    In the case at bar, there is no dispute that the letter sent by the attorney fails to satisfy a number of the declaration's requirements. First, the letter was sent via email, not "personally delivered, delivered by commercial messenger service, or mailed by registered or certified mail." Additionally, the letter does not state "the fact that Claimant will meet with Respondent to discuss in good faith ways to resolve the claim." Finally, while the letter makes reference to "upcoming litigation" and a "claim against the developer for certain construction defects," the letter does not state "the legal basis of the Claim (*i.e.*, the specific authority out of which the Claim arises)." The Association also claims that the letter failed to set forth "the proposed remedy," but we note that the letter indicated that the Association was planning on scheduling the required work within two weeks, leading to the conclusion that the proposed remedy was repair of the damaged areas.

¶ 56    The Association argues that the letter's failure to satisfy all of section 12.04(a)'s requirements means that the letter did not constitute "notice" so as to trigger the mandatory dispute resolution process. By contrast, the developers argue that any deficiencies are

- 14 -

immaterial, since they received actual notice that there was a claim against them. The trial court found that the letter was sufficient to trigger the dispute resolution process. However, we cannot agree with this conclusion.

¶ 57        As stated, there is no dispute that the letter does not satisfy a number of the requirements of section 12.04(a). Thus, there is no basis for concluding that it is a "notice" under that section. The developers' arguments that "actual notice" excuses any noncompliance with section 12.04(a) presupposes that the letter sent by the Association's attorney is, in fact, a notice under section 12.04(a); it is a circular argument. "The purpose of a contract's notice provision is to ensure that the notice was delivered and that the party was informed." *Denis F. McKenna Co. v. Smith*, 302 Ill. App. 3d 28, 32 (1998). It is axiomatic that, in order for notice to be sent, there must have been some type of "notice." The developers' argument would turn the letter into section 12.04(a) "notice" through the simple fact that the developers received it.

¶ 58        If the form of mailing was the sole way in which the letter failed to satisfy section 12.04(a), the developers' argument would be more persuasive, since a provision concerning the form of mailing is merely intended to ensure that the notice was delivered. *Vole, Inc. v. Georgacopoulos*, 181 Ill. App. 3d 1012, 1019 (1989) ("A provision requiring sending of notice by registered mail is merely intended to insure delivery."). However, that is not the case. In the case at bar, there were a number of ways in which the letter failed to satisfy the requirements for notice under section 12.04(a), and we do not agree with the developers that these failures are "immaterial."

¶ 59        For instance, the letter does not state "the legal basis of the Claim (*i.e.*, the specific authority out of which the Claim arises)," and does not state "the fact that Claimant will meet with Respondent to discuss in good faith ways to resolve the claim." The letter does not even mention arbitration or mediation at all, nor does it refer to section 12.04(a). The specific, detailed requirements of section 12.04(a) protect both parties. They protect the claimant both by ensuring that a communication that complies with the requirements of the section will undisputedly be considered notice to the respondent of a claim against it, and also by ensuring that not every communication sent to the respondent will trigger the dispute resolution procedures. They also protect the respondent by providing details concerning the claim and offering the opportunity to remedy it before proceeding to mediation or arbitration. The requirements of section 12.04(a) are clear and unambiguous. Thus, "they must be given their plain, ordinary and popular meaning." *Thompson*, 241 Ill. 2d at 441. Here, there is no dispute that not all of the requirements of section 12.04(a) were satisfied. Consequently, the letter sent to the developer cannot be considered a notice under that section and the trial court erred in finding that it was.

¶ 60        Keer also argues that he received the required notice by virtue of a letter sent to all unit owners by the Association's board on September 16, 2010. While this was not a basis for the trial court's dismissal of the complaint, we may affirm the dismissal of a complaint on any ground that is apparent from the record (*Golf*, 376 Ill. App. 3d at 275). The letter, which was received by Keer in his capacity as a unit owner, provided, in relevant part:

> "[T]he purpose of this letter is to clarify facts regarding exterior building issues and what led up to issues of payment for the required work. In the fall of 2009 management brought to Lennar's attention that there were defects to the exterior of the buildings. Two members of Lennar showed up and admitted that indeed it appeared that there was unfinished work done by the contractors regarding the balconies. They said they would

- 15 -

come back out the following summer (2010) to discuss scheduling repairs, but would not admit to any other defects.

But on November 5, 2009 Lennar sent out an email to us (see attachment) and again on August 24, 2010 a letter to our attorneys attaching a Release dated July 2008 and signed by the then Board President Larry Keer. In the Release, in return for approximately $28,500 towards elevator and boiler repairs, Larry Keer signed a Letter of Release that removed Lennar from any further work and held Lennar harmless from further issues. *As a result you will see from the attached documentation, 'Lennar respectively declines any responsibilities for any repairs to the project.[']*

This was the first time the current Board ever heard or saw of the Release.

This Release becomes very significant, since in August 2010 the current Board had a transition report completed where it was discovered that substantial work needs to be done to both buildings, amounting to close to $900,000. The Board sought Legal Council [*sic*], where it was learned that because of the Release signed by Larry Keer, the Association would likely lose any lawsuit against the developer[.]

It should be emphasized that by simply walking around the North building one could have seen cracked and crumbling masonry and unfinished balconies clearly visible to anyone who took the time to look. With such knowledge nobody could possibl[y] have signed the Release, which gave away the Association's ability to seek corrective action by Lennar.

Knowing that the suit by the Association would be dismissed, the only option open to the Association would be to sue Larry Keer in the hope that the Directors and Officers insurance would kick in to pay for the error made by signing the Release in the first place without having pertinent information regarding the repair costs." (Emphasis in original.)

¶ 61    We cannot find that this letter constitutes notice such that the mandatory dispute resolution process was triggered. As with the letter drafted by the Association's attorney, this letter does not satisfy all of section 12.04(a)'s requirements and therefore cannot be considered notice under that section. Furthermore, the letter itself was not even directed at Keer but was sent to all of the unit owners, and it was only in that capacity that Keer received the letter. A finding that such a letter serves to trigger the mandatory dispute resolution process would render section 12.04(a) effectively meaningless, since it would mean a communication could be considered notice even if (1) it did not comply with the declaration's clearly specified requirements and (2) it was part of a mass communication to all unit owners as opposed to a communication directed at the person against whom the claim was going to be made. Accordingly, we do not find this letter serves as an alternative basis for affirming the trial court's finding that the Association had waived its claims against defendants.

¶ 62                              B. Validity of Amendment to Declaration

¶ 63    Since we have concluded that there was no notice sent under section 12.04(a), the mandatory dispute resolution process was never triggered and the Association's claims against defendants were never waived for noncompliance with that process. However, the Association would still be required to submit its claims to mediation and arbitration under section 12.04(b)(iv) if not for the fact that, in 2011, the Association amended the declaration to remove

- 16 -

article 12 in its entirety. The trial court found this was a valid amendment, a ruling which the developers challenge in their cross-appeal.

¶ 64        The basis for the developers' argument is that section 12.05 concerned the amendment of article 12 and provided:

> "AMENDMENT OF ARTICLE: Without the express prior written consent of Declarant, this Article may not be amended for a period of twenty years from the effective date of this Declaration."

The developers claim that, because the amendment was done without their express prior written consent, the amendment was invalid.

¶ 65        The trial court found that section 12.05's restrictions on amending the declaration conflicted with the terms of the Act, rendering the restrictions void. In deciding a controversy concerning a condominium, "we must examine any relevant provisions in the Condominium Property Act [citation], and the declaration or bylaws of the condominium and construe them as a whole. [Citation.]" *Goldberg*, 2012 IL App (1st) 110620, ¶ 47. Further, the Act makes clear that "[a]ny provisions of a condominium instrument that contains provisions inconsistent with the provisions of this Act are void as against public policy and ineffective." 765 ILCS 605/2.1 (West 2010).

¶ 66        In the case at bar, the trial court found that section 12.05 was inconsistent with section 27 of the Act, which provides, in relevant part:

> "If there is any unit owner other than the developer, the condominium instruments shall be amended only as follows:
>
> (i) upon the affirmative vote of ⅔ of those voting or upon the majority specified by the condominium instruments, provided that in no event shall the condominium instruments require more than a three-quarters vote of unit owners; and
>
> (ii) with the approval of any mortgagees required under the provisions of the condominium instruments." 765 ILCS 605/27(a) (West 2010).

The trial court found that section 12.05 was invalid because "here[,] the Illinois legislature has defined the only manner by which amendments to condominium declarations can be accomplished—a ⅔, but not more than ¾ vote of the condominium owners. Defendant has inserted a term that is more onerous than the Act allows and requires the approval of the declarant. The Act does not allow for such a provision." We find the trial court's reasoning, and the Association's arguments, persuasive.

¶ 67        "The fundamental objective of statutory construction is to ascertain and give effect to the intent of the legislature." *1010 Lake Shore Ass'n v. Deutsche Bank National Trust Co.*, 2015 IL 118372, ¶ 21 (citing *Bettis v. Marsaglia*, 2014 IL 117050, ¶ 13). "The most reliable indicator of legislative intent is the statutory language, given its plain and ordinary meaning." *1010 Lake Shore Ass'n*, 2015 IL 118372, ¶ 21 (citing *State Building Venture v. O'Donnell*, 239 Ill. 2d 151, 160 (2010)). "A reasonable construction must be given to each word, clause, and sentence of a statute, and no term should be rendered superfluous." *1010 Lake Shore Ass'n*, 2015 IL 118372, ¶ 21 (citing *Slepicka v. Illinois Department of Public Health*, 2014 IL 116927, ¶ 14). " '[W]hen statutory language is plain and certain the court is not free to give it a different meaning.' " *Kalkman v. Nedved*, 2013 IL App (3d) 120800, ¶ 12 (quoting *In re Estate of Hoehn*, 234 Ill. App. 3d 627, 629 (1992)). "[A] court may not depart from the plain statutory language by reading into it exceptions, limitations, or conditions not expressed by the

legislature." *Kalkman*, 2013 IL App (3d) 120800, ¶ 12 (citing *In re Estate of Ellis*, 236 Ill. 2d 45, 51 (2009)).

¶ 68    In the case at bar, section 27(a) of the Act clearly provides that, "[i]f there is any unit owner other than the developer, the condominium instruments shall be amended *only as follows*." (Emphasis added.) 765 ILCS 605/27(a) (West 2010). We agree with the trial court that this language means that additional restrictions to the amendment process are not permitted. The developers argue that this language is intended merely to distinguish between amendments to the declaration, which are subject to a heightened threshold for amendments, and amendments to bylaws or rules passed by an association's board, which may be amended with fewer votes. We do not find this argument persuasive at all. First, the language does not *require* a heightened threshold but only *permits* it; section 27(a) requires the "affirmative vote of ⅔ of those voting or upon the majority specified by the condominium instruments," up to a three-quarters requirement, meaning that a simple majority could be sufficient if the condominium instrument so provides. 765 ILCS 605/27(a) (West 2010). Furthermore, had the legislature intended simply to impose a heightened threshold for amending a declaration without also prohibiting the imposition of more severe restrictions, it could have provided so specifically. In fact, it did so several times in the Act, including within other subsections of section 27. See, *e.g.*, 765 ILCS 605/27(b)(1) (West 2010) (providing vote requirements for correcting omissions or errors in condominium instruments "unless the Act or the condominium instruments specifically provide for greater percentages or different procedures"); 765 ILCS 605/15(a) (West 2010) ("Unless a greater percentage is provided for in the declaration or bylaws," setting forth minimum vote requirements for selling the property); 765 ILCS 605/14.3 (West 2010) ("Unless the condominium instrument expressly provides for a greater percentage or different procedures," setting a majority vote requirement for authorization of a grant of an easement for cable television cable). It did not do so with respect to section 27(a). Instead, it imposed a default threshold of a two-thirds affirmative vote, as well as an absolute ceiling of a three-quarters affirmative vote and stated that the declaration "shall be amended *only*" through this vote, along with the approval of any necessary mortgagees. (Emphasis added.) 765 ILCS 605/27(a) (West 2010). Thus, the language of the statute itself shows that the legislature specifically selected a range that it felt appropriate and limited the restrictions for amendments to that range. Indeed, section 27 originally did not provide a ceiling but only required "the affirmative vote of ⅔ of those voting or upon the majority specified by the condominium instruments." Ill. Rev. Stat. 1983, ch. 30, ¶ 327. Section 27 was amended in 1984 (Pub. Act 83-833, § 1 (eff. July 1, 1984)) to impose a ceiling of a three-quarters vote requirement, which demonstrates the legislature's desire not to permit overly severe vote requirements. Ill. Rev. Stat. 1983, ch. 30, ¶ 327(a). As noted, " '[w]hen statutory language is plain and certain the court is not free to give it a different meaning.' " *Kalkman*, 2013 IL App (3d) 120800, ¶ 12 (quoting *In re Estate of Hoehn*, 234 Ill. App. 3d at 629). Here, we find no basis for the developers' argument that section 27 was intended to mean something different than its plain language requires.

¶ 69    We are not persuaded by the developers' arguments that "Illinois courts have upheld *** similar additional requirements for amending a condominium declaration," because none of the cases cited by the developers has any application to the case at bar. First, in *Streams Sports Club, Ltd. v. Richmond*, 99 Ill. 2d 182, 192-93 (1983), there is no indication that there was any issue as to whether the declaration's requirements for amendments were valid under section

- 18 -

27(a) of the Act; the only issue concerning an amendment was whether the proposed amendment itself complied with those requirements, a question that the supreme court did not decide because it found that there was not enough information in the record. Moreover, the "additional requirement" in that case was simply a requirement that the secretary of the association's board certify the amendment, which is a far cry from the type of additional requirement the developer seeks to impose here.

¶ 70    Additionally, *Schaffner v. 514 West Grant Place Condominium Ass'n*, 324 Ill. App. 3d 1033, 1042 (2001), the second case cited by the developer, required the court to consider whether the proposed amendment was a scrivener's error such that section 27(b)(2) applied and did not involve section 27(a). In fact, section 27(a) would not have been applicable to that case, since the proposed amendment involved the diminishment of the common elements, which is governed by section 4(e) of the Act. See 765 ILCS 605/27(a) (West 1998) ("Except to the extent authorized by other provisions of this Act, no amendment to the condominium instrument shall change the boundaries of any unit or the undivided interest in the common elements ***."); 765 ILCS 605/4(e) (West 1998) (the percentages of ownership interest in the common elements allocated to each unit "shall remain constant unless otherwise provided in this Act or thereafter changed by agreement of all unit owners"). Thus, the court did not interpret the language of section 27(a) to determine if the restrictions to the amendments were permissible under that section. Similarly, the court in *Picerno v. 1400 Museum Park Condominium Ass'n*, 2011 IL App (1st) 103505, ¶ 14, was asked to consider a proposed amendment that would diminish the unit owners' interest in the common elements and was not asked to interpret the language of section 27(a); that case does not even set forth the declaration's amendment procedures, but only makes reference to "certain paragraphs of the declaration [that] require additional approval" (*Picerno*, 2011 IL App (1st) 103505, ¶ 26). These cases thus do not add support to the developers' argument that additional restrictions to the amendment process are permitted under the language of section 27(a).

¶ 71    We are similarly unpersuaded by the developers' reliance on *Scott v. York Woods Community Ass'n*, 329 Ill. App. 3d 492 (2002), a case they cite for a holding that 25- and 30-year restrictions on amendments were presumptively valid. However, *Scott* did not involve interpretation of the Act; indeed, it does not appear that there was even a condominium involved, as the case involved "homeowners in a residential community" and the association was a "Community Association."[7] *Scott*, 329 Ill. App. 3d at 493. Furthermore, as pointed out by the Association, the *Scott* court noted that "[a]lthough the amendment restrictions may strike some people as unwise, the Association never identified any statute or other expression of public policy that might bar them." *Scott*, 329 Ill. App. 3d at 501. Here, by contrast, the Act governs the condominium documents at issue and specifically provides that "[a]ny provisions of a condominium instrument that contains provisions inconsistent with the provisions of this Act are void as against public policy and ineffective." 765 ILCS 605/2.1 (West 2010). As we have concluded, the plain and clear language of section 27(a) of the Act provides the only method for amending the declaration and section 12.05 seeks to impose alternate, more severe,

---

[7]We also note that the name of the community appears to have simply been "York Woods" (see *Scott*, 329 Ill. App. 3d at 493), which also lends support to the conclusion that the community was not a condominium, as the Act requires the name of the condominium to include the word "Condominium" or be followed by the words "a Condominium." 765 ILCS 605/4(c) (West 2000).

restrictions. This is not permitted by the Act and, accordingly, the trial court properly found that the amendment removing article 12 in its entirety was valid. Since the amendment was valid, the Association was not required to submit its claims to mediation or arbitration prior to filing the instant lawsuit.

¶ 72                                    C. Scope of Releases

¶ 73        Our conclusion on the issues concerning article 12 of the declaration—that there was no notice such that the mandatory dispute resolution process was triggered and that the declaration was validly amended to remove that article—means that the Association's complaint should not have been dismissed based on noncompliance with the mandatory dispute resolution process. However, as noted, we may affirm the dismissal of a complaint on any ground that is apparent from the record. *Golf*, 376 Ill. App. 3d at 275. Accordingly, we must consider the effect of the releases executed by Keer when he was the Association's president.

¶ 74        In the case at bar, the Association, represented by Keer, and the developer executed two releases, one on July 18, 2008, and the other on October 30, 2008. According to the releases, which contained identical language, "[t]he Association *** made various claims against the Developer including, among other things, the 'Items' on the Punch list attached hereto as Exhibit A," which included problems such as broken concrete in the parking lot and improper placement of the wood trim in the hallways,[8] and "[t]he parties desire to resolve the claims made by the Association and any and all other future claims or causes of action." Accordingly, the developer agreed to pay the Association $20,734 in the July 18, 2008, release and agreed to pay $7779.53 in the October 30, 2008, release. In exchange, the Association agreed to release and discharge the developer from:

>    "any and all claims, causes of action, or liabilities whosoever, known or unknown, asserted or unasserted, whether arising out of contract, tort, or otherwise, in law or in equity arising, accruing, or based on any action or inaction of any such parties, including, without limitation, any claim for construction defects in connection with the construction of the improvements which are part of the Condominium, the administration of the Association prior to the turnover of control to a board of directors elected by the unit owners and the payment of assessments, charges or other amounts whatsoever due to the Association from the Developer."

¶ 75        The Association has raised two different arguments concerning the validity of the releases throughout the instant litigation. First, in responding to the developers' motion to dismiss its second amended complaint, the Association argued that Keer did not have the authority to execute the releases on behalf of the Association; this argument also serves as the basis for the counts of the Association's complaint that allege that Keer breached his fiduciary duty to the Association. On appeal, however, the Association focuses on the scope of the releases, arguing

---

[8]As noted, "Exhibit A" was identical in both releases, except that in the exhibit attached to the October 30, 2008, release, there was an additional item that provided that, "[a]s a result of [water-seepage issues due to the pitch of the garage floor], the elevator system control sustained $20,734 of damage." The "status" of this item provided that "[the developer] has reimbursed the [Association] for the cost of the repairs." We note that the $20,734 listed as the amount of damage is also the precise amount the developer agreed to pay in the July 18, 2008, release.

that the claims against the developers were not encompassed within the language of the releases. The developers claim that this change of focus means that the Association "does not contest" Keer's authority to execute the releases on appeal. We find this to be an overly restrictive characterization of the Association's position, especially given that the issue the developers claim is "not contest[ed]" serves as the basis for two counts of the complaint. Accordingly, we consider both of the Association's arguments concerning the validity of the release.

¶ 76    A release " 'is the abandonment of a claim to the person against whom the claim exists.' " *Thornwood, Inc. v. Jenner & Block*, 344 Ill. App. 3d 15, 21 (2003) (quoting *Hurd v. Wildman, Harrold, Allen & Dixon*, 303 Ill. App. 3d 84, 88 (1999)); *Fuller Family Holdings, LLC v. Northern Trust Co.*, 371 Ill. App. 3d 605, 614 (2007). It is a contract and is therefore governed by contract law. *Farm Credit Bank of St. Louis v. Whitlock*, 144 Ill. 2d 440, 447 (1991) (citing *Polo National Bank v. Lester*, 183 Ill. App. 3d 411, 414 (1989)).

¶ 77    "A contract executed by a party that does not have authority is void *ab initio*." *Alliance Property Management, Ltd. v. Forest Villa of Countryside Condominium Ass'n*, 2015 IL App (1st) 150169, ¶ 29 (citing *Illinois State Bar Ass'n Mutual Insurance Co. v. Coregis Insurance Co.*, 355 Ill. App. 3d 156, 164 (2004)). Such authority may be actual or apparent, and actual authority may be either express or implied. *Cove Management v. AFLAC, Inc.*, 2013 IL App (1st) 120884, ¶ 23. "Express authority is actual authority granted explicitly by the principal to the agent, while implied authority is actual authority proven circumstantially by evidence of the agent's position. [Citation.] Apparent authority, by contrast, is authority imposed by equity. [Citation.]" *Cove Management*, 2013 IL App (1st) 120884, ¶ 23. "Generally, the question of whether an agency relationship exists and the scope of the purported agent's authority are questions of fact." *Kaporovskiy v. Grecian Delight Foods, Inc.*, 338 Ill. App. 3d 206, 210 (2003).

¶ 78    With respect to condominiums, the unit owners' association is responsible for the overall administration of the condominium property through its duly elected board of managers. 765 ILCS 605/18.3 (West 2006). This board of managers "shall exercise for the association all powers, duties and authority vested in the association by law or the condominium instruments except for such powers, duties and authority reserved by law to the members of the association." 765 ILCS 605/18.4 (West 2006).

¶ 79    In the case at bar, section 5.10 of the bylaws provides that, "[e]xcept as otherwise expressly provided herein or in the Declaration, any action may be taken upon the affirmative vote of a majority of the Directors present at a meeting at which a quorum is present." Furthermore, section 8.01 discusses authority for the execution of instruments:

> "EXECUTION OF INSTRUMENTS: The Board may authorize any officer or officers, agent or agents of the Condominium Association, in addition to the officers so authorized by these By-Laws, to enter into any contract or execute and deliver any instrument (including amendments to the Declaration or these By-Laws which must be executed by the Condominium Association) in the name of and on behalf of the Condominium Association and such authority may be general or confined to specific instances. In the absence of any such authorization by the Board, any such contract or instrument shall be executed by the President or a Vice President and attested to by the Secretary or an Assistant Secretary of the Condominium Association."

Thus, in order for there to be actual authority to execute the releases at issue, (1) the action must have been approved by a majority of the directors at a meeting at which a quorum is present or (2) the contract must have been executed by the Association's president or vice president and attested to by the secretary or an assistant secretary. Here, the complaint alleges that at the time of the execution of the releases, Keer did not have the approval of a majority of the board to execute the releases. Furthermore, while Keer was the president of the Association at the time, an examination of the releases shows that they were executed by Keer and by the developer's representative; there is no attestation by the Association's secretary or assistant secretary. Thus, taking the facts alleged in the complaint as true, as we must when reviewing a motion to dismiss (*Snyder v. Heidelberger*, 2011 IL 111052, ¶ 8), under the terms of the bylaws, Keer had no actual authority to execute the releases.

¶ 80    Furthermore, Keer did not have apparent authority to execute the releases. Apparent authority is the authority that a reasonably prudent person would naturally suppose the agent to possess, given the words or conduct of the principal. *State Security Insurance Co. v. Burgos*, 145 Ill. 2d 423, 431-32 (1991). "It is a well-established precept of agency law that a principal will be bound by the authority he *appears* to give to another, as well as that authority which he actually gives." (Emphasis in original.) *Burgos*, 145 Ill. 2d at 431 (citing *Lynch v. Board of Education of Collinsville Community Unit District No. 10*, 82 Ill. 2d 415, 426 (1980)). Once the principal has created the appearance of authority, he is estopped from denying it to the detriment of a third party. *Burgos*, 145 Ill. 2d at 432. To establish apparent agency, the party alleging the existence of the agency must prove that (1) the principal or its agent acted in a manner that would lead a reasonable person to believe that the individual allegedly at fault was an employee or agent of the principal, (2) the principal had knowledge of and acquiesced in the acts of the agent, and (3) the injured party acted in reliance upon the conduct of the principal or its agent, consistent with ordinary care and prudence. *Wilson v. Edward Hospital*, 2012 IL 112898, ¶ 18. However, "[i]f [the third person] knows, or has good reason for believing, that the acts exceed the agent's powers or if such reasonable inquiry as he is under the duty to make, would result in discovery of the true state of the powers, and he fails to fulfill that duty, he cannot assert an apparent authority effective against the principal." (Internal quotation marks omitted.) *Cove Management*, 2013 IL App (1st) 120884, ¶ 27.

¶ 81    In the case at bar, the bylaws were attached to the declaration, which was drafted by the developers. Accordingly, the developers would have, or should have, been aware of the provisions of the bylaws, including those provisions defining the authority to execute contracts on the Association's behalf. When the releases were signed by Keer alone, the developers therefore should have known that he was acting outside the scope of his authority. Given their knowledge of the bylaws, there can be no argument that the Association gave the developers reason to believe that Keer had the authority to execute the releases. Thus, Keer did not have apparent authority to execute the releases.

¶ 82    The developers argue that, even if Keer did not have actual or apparent authority, the Association nonetheless ratified his signature by accepting the funds provided in exchange for the releases. Even if an agent did not have authority to execute a release, it is possible for the principal to be bound by the release if the principal later ratified it. *Borsellino v. Putnam*, 2011 IL App (1st) 102242, ¶ 104. "Ratification occurs when the principal learns of an unauthorized transaction, then retains the benefits of the transaction or takes a position inconsistent with

nonaffirmation." (Internal quotation marks omitted.) *Cove Management*, 2013 IL App (1st) 120884, ¶ 31.

¶ 83    In the case at bar, however, there is no indication that the Association was aware of the releases at the time that it accepted any funds from the developers. Indeed, in its letter to the unit owners, which Keer attached to his motion to dismiss, the Association's board states: "[O]n November 5, 2009 Lennar sent out an email to us (see attachment) and again on August 24, 2010 a letter to our attorneys attaching a Release dated July 2008 and signed by the then Board President Larry Keer. In the Release, in return for approximately $28,500 towards elevator and boiler repairs, Larry Keer signed a Letter of Release that removed Lennar from any further work and held Lennar harmless from further issues. As a result you will see from the attached documentation, 'Lennar respectively declines any responsibilities for any repairs to the project.['] This was the first time the current Board ever heard or saw of the Release." (Emphasis omitted.) Thus, according to this letter, the Association did not become aware of the releases until over a year after their execution and so, at this early stage of the proceedings, we cannot find that the Association ratified the releases. See *Alliance Property Management*, 2015 IL App (1st) 150169, ¶ 41 (finding no ratification where "the Board did not have knowledge of the restriction in the bylaws during the relevant period"). Since it is not clear as a matter of law that Keer had the authority to execute the releases, we cannot find the releases to provide an alternate basis to affirm the trial court's dismissal of the Association's second amended complaint. Accordingly, the trial court's dismissal must be reversed.

¶ 84                                        II. Attorney Fees and Sanctions

¶ 85    The parties also raise several issues concerning the trial court's award of attorney fees. Specifically, the Association argues that the trial court should not have awarded attorney fees at all, and if it did properly award some fees, it nevertheless awarded too much. By contrast, the developers argue that the trial court should have awarded more and also argue that the trial court should have considered their motion for Rule 137 sanctions. However, since we have determined that the trial court erred in dismissing the Association's second amended complaint, we have no need to consider the arguments concerning attorney fees, as the case remains active. Similarly, we have no need to consider the propriety of the trial court's decision concerning Rule 137 sanctions.

¶ 86                                             CONCLUSION

¶ 87    For the reasons set forth above, the trial court erred in finding that the Association had waived its claims against defendants by failing to follow the mandatory dispute resolution procedures set forth in article 12 of the declaration. Furthermore, since that article was subsequently amended, the Association could properly proceed directly to a lawsuit without first seeking mediation or arbitration. Accordingly, we find that the trial court erred in dismissing the Association's second amended complaint. We further find that the releases signed by Keer do not provide an alternate basis for affirming the trial court's dismissal, as the facts as alleged in the complaint show that Keer did not have the authority to execute the releases.

¶ 88       Reversed.